481 So.2d 10 (1985)
BOOKER CREEK PRESERVATION, INC., Appellant,
v.
MOBIL CHEMICAL COMPANY, et al., Appellees.
No. BE-62.
District Court of Appeal of Florida, First District.
November 21, 1985.
Rehearing Denied January 24, 1986.
*11 Peter B. Belmont, St. Petersburg, for appellant.
Roger W. Sims, Lawrence E. Sellers, Jr., of Holland & Knight, Lakeland, and Charles G. Stephens, Asst. Gen. Counsel, Dept. of Environmental Regulation, Tallahassee, for appellees.
THOMPSON, Judge.
This is an appeal from a final order of the Department of Environmental Regulation (DER) granting water discharge permits for the South Fort Meade (SFM) phosphate mine which the appellee Mobil Chemical Company (Mobil) is planning to build. The appellant contends, inter alia, that DER erred in determining that the proposed SFM mine was not under department order to obtain a ground water permit and thus was an "existing installation" for purposes of determining the applicability of the ground water rule. The appellant further contends DER erred in concluding that Mobil had provided reasonable assurances that no subsurface anomalies existed in the ground beneath the mine site which might allow dispersion of polluted water in violation of the ground water rule. On cross-appeal the appellee contends that the appellant did not have standing to intervene in this action or to bring this appeal. We reverse with respect to the above-stated issues on appeal and affirm on cross-appeal.
Mobil plans to construct its new SFM mine adjacent to the Peace River in southern Polk County. This mine will replace a nearby existing mine where the phosphate reserves are or will soon be exhausted. The new mine will use the same ore refining processes that are currently being used at the old mine, which processes involve the use and to some extent the pollution of large quantities of water. It is expected that when the mine is in operation some 150 million gallons of water will circulate through it each day. It is further expected that almost 3 million gallons of water per day will be discharged into the ground at the mine site. It is undisputed that these discharged waters will not meet state water quality standards for fluorides, sulphates and total dissolved solids.
The primary discharge points for these polluted waters will be the areas beneath three huge waste product settling and storage ponds which will be located in the southeast corner of the mine site. Two of *12 these waste storage ponds will hold clay slime, while the third will hold sand tailings. One of the clay slime ponds will be approximately 750 acres in size, while the other will cover some 500 acres. The sand tailings storage area will cover 400 acres.
In 1981 Mobil applied to DER for a surface water discharge permit and in 1982 Mobil filed an addendum to its application seeking approval to also discharge to ground waters. No separate ground water discharge permit application was filed, apparently on the strength of Rule 17-4.245(1)(a) F.A.C. which provides in part:
It is the intent of the Department whenever possible to incorporate ground water discharge considerations into other appropriate Department permits, and not to require a separate permit for ground water discharges... .
In October 1983 DER notified Mobil of its intent to issue the requested water discharge permits. Appellant Booker Creek Preservation, Inc. (Booker) then filed a petition and an amended petition seeking a formal hearing pursuant to § 120.57(1), Fla. Stat. for the purpose of contesting DER's proposed issuance of the permits. Booker sought to intervene in this licensing proceeding pursuant to § 403.412(5), Fla. Stat., and did not allege or attempt to prove at the hearing that it or any of its members are neighboring landowners, are actual users of the Peace River, or are persons who have any specific interest which will or may be affected by Mobil's proposed water discharges.
While Mobil's application for a water discharge permit was being processed, DER also acted on Mobil's application for a permit to construct a dam around one of the slime ponds that it planned to build at the SFM mine. Booker objected and petitioned for an informal hearing pursuant to § 120.57(2), Fla. Stat., asserting that the dam construction permit should not be issued since Mobil's application therefor had not included data on potential ground water discharges and did not provide reasonable assurances that waters seeping out of the completed slime ponds would not violate ground water quality standards. In its June 1982 order finding that the construction permit should be issued, DER found that the question whether the dam construction permit should issue was not the same as the question whether a ground water discharge permit should issue, and stated that it was acting only on the dam construction permit. However, DER apparently recognized the legitimacy of the concerns expressed by Booker during the dam construction permitting proceedings, since in its order granting the dam construction permit it expressly provided that Mobil "shall, prior to beginning operations, obtain all appropriate permits, including approvals to discharge to ground water."
In August 1982, after DER had issued the order granting the dam construction permit, the Environmental Regulation Commission amended its ground water rules. Among the rules amended was a rule relating to "zones of discharge." The new rule reduced the size of the zone surrounding a pollution source into which water not meeting applicable water quality standards could be discharged. Existing installations were "grandfathered" or exempted from the operation of the new rule. The grandfather clause, Rule 17-4.245(1)(c), F.A.C., defines an existing installation as:
[Any] installation having filed a complete application for a water discharge permit on or before January 1, 1983, or in fact discharging to ground water on or before July 1, 1982. "Existing Installation" shall not include any installation under Department Order to obtain a ground water permit... .
Existing installations therefore were excepted from meeting the requirements of the new rule unless they were under DER order to obtain a ground water permit. In two partial summary orders which were approved by DER in the final order on appeal, the hearing officer found that Mobil was not "under department order to obtain a ground water permit" and that the SFM mine therefore was an "existing installation" which should be exempted from the operation of the new rule.
*13 The clear and unambiguous language of the order of DER dated June 11, 1982 granting the dam construction permit provides that Mobil "shall, prior to beginning operation, obtain all appropriate permits, including approvals to discharge to ground water." (e.s.) The only argument that Mobil made in response to Booker's assertion that the SFM mine was not an existing installation was that the order required only "approval" of ground water discharge and not a "permit" for such discharge. It is obvious from the language in the order, however, that the terms "permit" and "approval" are used interchangeably and that the "approval" to discharge to ground water was one of the permits that the order required Mobil to obtain. Mobil was therefore under DER order to obtain a ground water permit prior to beginning operations at its new mine. The SFM mine was not an "existing installation" that was grandfathered. The order of DER holding that the SFM mine was an existing installation is reversed and the cause is remanded for entry of an order finding that the mine is not an "existing installation" and that Mobil must obtain ground water discharge permits under the new rule before commencing operation of its slime ponds and sand storage pond.
Evidence adduced at the hearing indicated that three aquifers underlie the mine site, and that the aquifer transmissivity characteristic for the surficial aquifer is very low. Accordingly, polluted waters which seep from the slime ponds or the sand tailings pond into the ground will migrate very slowly if the waters remain in the surficial aquifer. However, the transmissivity characteristics of the lower two aquifers are much greater. Therefore, if subsurface anomalies such as faults, vertical fissures or sinkholes (Karst features) are present beneath the slime ponds and sand tailings area, and if these ground faults extend downward through the barrier layers separating the surficial aquifer from the lower aquifers so as to permit water seeping out of the ponds to drain into the lower aquifers, those waters and any pollutants contained therein will be dispersed much more rapidly and widely. Radar testing conducted by Mobil at the site of one of the planned slime ponds indicated that Karst features might exist beneath that pond, but test drilling and geologic surveys revealed no such faults and gave no indication that water seeping out of that pond would flow into the lower aquifers. Mobil performed no tests to determine whether Karst features might exist beneath the second slime pond or the sand tailings storage area.
In her recommended order, the hearing officer found that Mobil had presented evidence that any discharges to ground waters would move very slowly and that any changes in water quality as a result of said discharges would occur gradually over an extended period of time. After noting that Mobil had performed "numerous" studies of the soils and geology of the mine site, she found that "an applicant for a water discharge permit is not required to perform every known testing device on every foot of his property to establish entitlement to a permit." She then concluded that Mobil had provided DER with reasonable assurances that its proposed discharges to ground waters would not violate established water quality standards outside the applicable zone of discharge. We agree that an applicant for a water discharge permit need not "perform every known testing device on every foot of his property" in order to establish entitlement to a permit. However, we totally disagree with the hearing officer's conclusion that Mobil provided reasonable assurances that its proposed discharges to ground water would not affect water quality beyond the applicable zone of discharge.
It was undisputed that Karst features may exist beneath the proposed discharge areas, and that if present, such faults might allow much wider and more rapid dispersion of pollutants than Mobil has predicted. When a permit applicant proposes to build pollutant discharging industrial facilities in an area where Karst features are likely to be found, and where, as here, the applicant proposes to build three separate *14 and massive facilities, the smallest of which will constitute a "point" of discharge approximately two-thirds of a square mile in size, the performance of geologic tests beneath but one of the three proposed "points" of discharge cannot, as a matter of law, provide reasonable assurances that the proposed facilities will not cause a violation of established water quality standards beyond the applicable zone of discharge. The DER's adoption of the hearing officer's conclusion in this regard was erroneous, and is reversed.
We affirm the order of the hearing officer that Booker had standing to intervene in the proceedings below. Section 403.412(5), Fla. Stat.; Manasota  88 Inc. v. Department of Environmental Regulation, 441 So.2d 1109 (Fla. 1st DCA 1983).
Reversed in part and affirmed in part.
MILLS and SMITH, JJ., concur.