# FRIENDS OF FORT GEORGE, INC., et al. v FAIRFIELD COMMUNITIES, INC., et al. (Consolidated)

## Case Nos. 85-3537 and 85-3596

State of Florida, Division of Administrative Hearings

October 6, 1986

## APPEARANCES OF COUNSEL

**Segundo J. Fernandez, Terry Cole,** and **Douglas P. Manson** for Friends of Fort George, Inc., et al., Logan Diving, Inc., and Southeastern Fisheries Association, Inc.

**Charles Lee,** Senior Vice President, Florida Audubon Society, for The Florida Audubon Society and Duval Audubon Society.

**J. Stephen O'Hara, Jr.** for Florida Wildlife Federation.

**Thomas G. Pelham** and **William L. Hyde** for Fairfield Communities, Inc.

**Kathryn L. Mennella** for St. Johns River Water Management District.

## OPINION

DONALD D. CONN, Hearing Officer.

### RECOMMENDED ORDER

A final hearing was held in the above-styled consolidated cases before Donald D. Conn, a duly designated Hearing Officer of the Division of Administrative Hearings, in Jacksonville, Florida, on April 9-11 and May 19-23, 1986, and in Tallahassee, Florida on June 9, July 21-24 and August 4-6, 1986.

At the hearing, the parties called for a total of 37 witnesses during their cases-in-chief and nine rebuttal witnesses. Including composite exhibits, Petitioners and Intervenors introduced a total of 26 exhibits, Respondent Fairfield Communities introduced a total of 71 exhibits, and the St. Johns River Water Management District introduced 11 separate exhibits in addition to adopting 22 exhibits introduced by Fairfield. The transcript of the hearing consists of 28 volumes and the last volume of the transcript was filed on August 14, 1986. The parties were allowed to submit posthearing proposed findings of fact, conclusions of law and recommended orders by August 29, 1986, and a ruling on each proposed finding of fact is included in the Appendix to this Recommended Order.

### Nature of the Controversy

Case Number 85-3537 involves a third-party challenge by Petitioner, Friends of Fort George, Inc., et al., to the District's proposed issuance of a conceptual approval with conditions for the surface water manage-

ment system of a development which includes residential units, commercial space, and a 27-hole golf course on Fort George Island, Duval County, Florida. Petitioners and Intervenors, Southeastern Fisheries, Logan Diving, and Florida Wildlife Federation, assert that Fairfield Communities, Inc., as the permit applicant, bears the burden of proof of showing entitlement to the requested permit under all applicable rules. They further assert that Fairfield has failed to show entitlement to the requested permit. In particular, Petitioners assert that Fairfield has not demonstrated that the proposed management and storage of surface water (MSSW) permit will comply with the applicable rule criteria, and that furthermore, without such assurances, the water resources of the state are likely to be harmed. Intervenors, Florida Audubon Society and Duval Audubon Society, state that the applicant has failed to provide the required assurances that the requested conceptual approval of the management and storage of surface waters meets the requirements of Rule Chapters 40C-4, and 40C-42, *Florida Administrative Code*, and has further failed to demonstrate that the proposed MSSW will not impair, pollute, or injure the waters and natural resources of the State. It is in the position of Respondent Fairfield Communities that its proposed MSSW application is fully in accord with the applicable statutes, and rules of the St. Johns River Water Management District, and therefore that the District should enter a Final Order granting to Fairfield conceptual approval of the MSSW permit.

After review of the application for conceptual approval submitted by Fairfield, as amended on April 7, 1986, staff of the St. Johns River Water Management District recommended approval of said application with conditions as set forth in a technical staff report entitled "Management and Storage of Surface Waters, May 1986."

Case Number 85-3596 involves a third-party challenge brought by Petitioner Friends of Fort George, Inc., et al., to the District's proposed issuance to Fairfield of a consumptive use permit (CUP) for the use of groundwater from the middle water bearing zone (MWBZ) of the Floridan Aquifer to serve an estimated population of 1,649 people in seven years and for supplementary golf course irrigation. The proposed permit will also allow Fairfield to withdraw water from the surface water management system (which intercepts the surficial aquifer) on Fort George Island as the primary source of golf course irrigation. Petitioners assert that Fairfield Communities, Inc., as the permit applicant, bears the burden of proof of showing entitlement to the requested permit under all applicable rules. Petitioners further assert that Fairfield has failed to show entitlement to the requested

194

permit. In particular, Petitioners assert that Fairfield has not demonstrated that the proposed consumptive use will comply with the applicable rule criteria, and that furthermore, without such assurances, that the water resources of the state are likely to be harmed. Intervenors, Florida Audubon Society and Duval Audubon Society state that the applicant has failed to provide the required assurances the requested consumptive use meets the requirements of Rule 40C-2.301, *Florida Administrative Code*, and has further failed to demonstrate that the proposed consumptive use will not impair, pollute or injure the waters and natural resources of the State. It is the position of Fairfield that its proposed CUP application is fully in accord with the applicable rules and regulations of the District, specifically Chapter 373, *Florida Statutes* (1985), and Rule 40C-2, *Florida Administrative Code*, and, therefore, that the District should enter a final order granting to Fairfield the CUP.

After review of the application for a consumptive use permit submitted by Fairfield Communities, Inc., as amended on March 11, 1986, staff of the St. Johns River Water Management District recommended approval of said application with conditions as set forth in a Consumptive Uses of Water Summary Sheet dated March 24, 1986.

### Evidentiary Matters

During the hearing, a ruling was reserved on the admissibility of Petitioners' exhibits 96 (Jacksonville Planning Department review of the Master Resource Management Plan and Conditions for Approval) and 120A (deposition of Daniel Ward). Fairfield and the District object to these exhibits on the grounds of relevance, and also object to exhibit 120A on the further ground that it does not present the testimony of an expert in accordance with Rule 1.330(a)(3)(F), Florida Rules of Civil Procedure. After having reviewed these exhibits and considering the issues and evidence presented in this case, the objections are overruled and these exhibits admitted.

### FINDINGS OF FACT

The following findings of fact are based on the evidence presented and relate both to Fairfield's MSSW and CUP applications:

1. Fort George Island is an approximately 900 acre island located northeast of the City of Jacksonville in Duval County, Florida. It is bounded to the north and east by the Fort George River, to the west by an extensive salt marsh, and to the south by Batten Island and the St. Johns River. The island is separated from the Atlantic Ocean by Little Talbot Island.

195

2. There are presently approximately 16 homes on Fort George Island, an existing 18-hole golf course with clubhouse, the Kingsley Plantation State Park in the north and the Rollins Bird and Plant Sanctuary in the southeastern quadrant. The off-site surface waters on the northern two-thirds of the island are Class II waters, while the waters to the south are Class III.

3. The following factors concerning Fort George Island are of ecological significance:

a) Existence of a large area of coastal hammock;

b) Value of the coastal hammock for scientific research and as a food source for migrating song birds;

c) Fact that the Island is located in an aquatic preserve;

d) Salt marshes on the western side of the Island which are a food source for wading birds;

e) State lands on the Island which are utilized as wildlife and plant preserve, as well as for historical purposes;

f) Estuaries on the western side of the Island which function as primary nursery areas for commercial and sport fishery species, as well as for shrimp, oysters and crabs;

g) Existence of commercial oyster leases on the western side of the Island; and

h) Public use of the Island's shoreline for oystering and clamming.

4. Fairfield owns approximately 757.5 acres on Fort George Island which is proposes to develop into a "planned unit development" of 1,343 dwelling units, a 27 hole golf course, and approximately 80,000 square feet of commercial development. The approximate density of the development will be 1.8 units per acre. Approximately 80% of Fairfield's property is currently forested, and after development approximately 35% will remain undisturbed habitat. The City of Jacksonville approved the "planned unit development" on January 10, 1983.

5. Because the Department of Community Affairs had determined on August 11, 1982, that this development was a "development of regional impact," Fairfield submitted an Application for Development Approval to the Department, the Northeast Florida Regional Planning Council, and the City of Jacksonville, which subsequently approved the proposed development in an Amended Development Order. On January 25, 1984, the Florida Land and Water Adjudicatory Commission approved the Amended Development Order (ADO).

6. In addition to approving the development of a maximum of 1,343

units, 80,000 square feet of commercial area, two 18 hole golf courses (one already in existence), and a marina with not more than 50 slips, the ADO required Fairfield to conduct a 12 month study and prepare a Master Resource Management Plan prior to development. Specifically, Fairfield was required to: demonstrate that there is a sufficient supply of potable ground water to serve the entire development without adverse effects on the Floridan Aquifer and other existing legal users; establish the ambient conditions of the water surrounding Fort George Island and the ambient climatic conditions of the Island and Rollins Sanctuary through a 12 month monitoring program; identify all endangered, threatened, unique, rare, notable and "special of special concern" and determine their habitat requirements; address surface water quality and quantity, terrestrial and wetlands biology, and ground water quality and quantity for the entire project; and submit a revised Master Land Use Plan, consistent with the Master Resource Management Plan, to the City of Jacksonville's Planning Commission for its approval.

7. Further, the ADO required Fairfield to demonstrate that it could retain the 100 year, 24-hour storm (calculated to be 11.04 inches of rain in 24 hours), and prevent degradation of the established ambient conditions of the waters surrounding Fort George.

8. Finally, the ADO required Fairfield to submit its Master Resource Management Plan to the City, Regional Planning Council, Department of Community Affairs, Department of Environmental Regulation, Department of Natural Resources, Game and Fresh Water Fish Commission, and the District, for their review, comment, and in some cases approval. After review and comment by these agencies, the City of Jacksonville Planning Commission approved the Master Resource Management Plan on January 29, 1986, from which no appeal was taken.

### Case Number 85-3537(MSSW)

The following findings of fact are based upon the stipulation of the parties and relate to Fairfield's MSSW application:

9. The District, a special taxing district and agency, created by Chapter 373, is charged with the statutory responsibility of the administration and enforcement of permitting programs pursuant to Sections 373.413 and 373.416, *Florida Statutes*, and Chapter 40C-4, *Florida Administrative Code*. The District is the agency involved in this proceeding. The District has assigned Fairfield's conceptual MSSW permit application the permit number 4-0310992AC.

10. Fairfield is a Delaware corporation authorized to do business in

**197**

Florida. Its address is 3520 Piedmont Road, N.E., Atlanta, Georgia 30305. The proposed MSSW will serve Fairfield's development on Fort George Island, located in Duval COunty at Section 34, Township 15, Range 29 East.

11. Petitioner Friends of Fort George, Inc., is a not-for-profit Florida corporation, whose principal office for the transaction of business is located at 11251 Fort George Road, East, Jacksonville, Florida 32226.

12. Petitioner in Intervention Southeastern Fisheries Association is a Florida not-for-profit corporation whose address is 312 East Georgia Street, Tallahassee, Florida 32301.

13. Petitioner in Intervention Logan Diving, Inc., is a Florida corporation whose address is 5731 St. Augustine Road, Jacksonville, Florida 32207.

14. Petitioners in Intervention Florida Audubon Society and Duval Audubon Society are not-for-profit Florida corporations whose principle offices for the transaction of business are located at 1101 Audubon Way, Maitland, Florida 32751 and 2965 Forest Circle, Jacksonville, Florida 32217.

15. Individual Petitioners William E. Arnold, Jr., William M. Bliss, Doris B. Chappelle, Leo E. Chappelle, Mr. and Mrs. Rhodes Gay, Dr. and Mrs. William J. Knauer, Jr., Camillus S. Lengle, Jr., and Mr. and Mrs. J.W. Lucas are natural persons and citizens of the State of Florida who are owners of real property on Fort George Island.

16. On August 27, 1985, the District gave Notice of its intent to deny MSSW application No. 4-031-002AC.

17. On September 23, 1985, the District determined to recommend issuance of MSSW Application No. 4-0310002AC, as then modified, with conditions.

18. Fairfield had originally contemplated in both its original Master Resource Management Plan (MRMP) and the referenced MSSW application that its proposed development for Fort George Island would have a 36-hole golf course facility. Fairfield subsequently reduced its proposed golf course facility from 36 holes to 27 holes. The City of Jacksonville's Planning Commission approved the MRMP with conditions, including the condition that the golf course be reduced, on January 29, 1986.

19. Because of the reduction in size of Fairfield's proposed golf course facility from 36 to 27 holes Fairfield's total requirements for water for irrigation were reduced.

20. By pleading dated April 7, 1986, Fairfield moved to amend its

198

conceptual MSSW approval application. On April 10, 1986, the motion was granted pursuant to Stipulation of all the parties. The motion was granted by written Order of the Hearing Officer on April 17, 1986.

21. The Petitioners' original Petition for Formal Administrative Proceedings was timely filed within fourteen (14) days of receipt of the District's proposed agency action of September 23, 1985.

22. A number of the members of Friends of Fort George, Inc. own real property on Fort George Island, reside on the Island, and engage in recreational activities on the Island and its adjacent waters and environs.

23. The subject matter of the proposed agency action challenged by Petitioners and Intervenors concerns the natural resources on Fort George Island. Protection of this resource falls within the general purpose and objectives of Friends of Fort George, Inc., namely, the preservation, conservation, and restoration of Fort George Island and surrounding environs.

24. The relief requested in this proceeding by Petitioners and Intervenors is denial of the conceptual management and storage of surface waters permit.

25. The water storage ponds proposed in the project will intersect with the surficial aquifer on Fort George Island.

26. Petitioners, Friends of Fort George, Inc. and Intervenors, Florida Audubon Society and Duval Audubon Society have standing pursuant to Section 403.412(5), *Florida Statutes*, to bring this action.

27. During the hearing, the parties stipulated that Logan Diving, Inc., has standing in this proceeding since it is the holder of oyster and clam harvesting leases from the Department of Natural Resources for beds located in Class II waters adjacent to Fort George Island and it derives substantial income from harvesting of these beds. Closure or reclassification of these waters to limit or preclude shellfish harvesting would impair the value of Logan Diving's shellfish leases, or render them worthless.

The following findings of fact relating to Fairfield's MSSW application are based upon the evidence presented, including the demeanor and credibility of witnesses who testified:

28. Southeastern Fisheries Association, Inc., established at the hearing that it is a not-for-profit incorporated association of seafood producers, packers, canners, processors, wholesalers, retailers and others substantially involved in the seafood and fishing industries. Based upon the testimony of Robert P. Jones, 200 to 250 of the Association's

350 members shrimp in waters in the vicinity of Fort George Island, 26 of its members are residents of Duval or Nassau Counties and 6 are residents of Fort George Island. Thus, a significant number of the Association's members harvest and transport seafood from the waters in the area of Fort George Island, and others also pack and process seafood from these waters. They would be substantially affected if the qualify of these waters was degraded, or if the waters were closed to shellfish harvesting as a result of destruction to the nursery areas or reduction in quality or quantity of fish or shellfish which are harvested in these waters, or which utilize these waters as nursery areas. The objectives and purposes of the Association include promoting the general welfare of the fisheries industry and enhancing its economic progress. In contrast, the Florida Wildlife Federation was allowed to participate in this hearing but failed to offer any evidence in support of its verified Petition at the hearing.

29. Fairfield's MSSW application is for conceptual approval, pursuant to District rule, and if conceptual approval is obtained Fairfield will then have to re-apply for construction, operation and maintenance MSSW permits. Although this is an application for conceptual approval, the documentation and information submitted by Fairfield to the District in support of its application is more thorough and complete than almost any other application for conceptual approval received by the District, and is actually superior to the documentation and information received from most applicants for construction permits. According to District staff, more sampling and testing results are presented in this conceptual application than they ever get.

30. After initial review of its MSSW application by District staff following submission on January 5, 1984, Fairfield received a request for additional information. In responding to this request, Fairfield developed a plan of study which was approved by District staff and which focused on the water supply potential of the surficial aquifer, and the ability of a stormwater management and control system to retain stormwater on-site in compliance with the ADO and the District's permitting rules.

31. Fairfield's study was comprehensive, and was completed in a very competent, professional manner. It included the collection of data through soil borings, installation of monitoring wells, conducting permeability and percolation tests, collecting rainfall data, and sampling of water quality.

32. A water budget model was developed, and approved by the District, to compare existing conditions to proposed developed condi-

200

tions and to specifically determine the water supply potential of the surficial aquifer, assess the availability of water for irrigation after development, assess changes in recharge to the surficial aquifer after development, and generally to determine how the development would impact the existing hydrologic cycle on the Island. Considering all of the evidence presented, it is specifically found that Fairfield utilized correct and appropriate input parameters in its water budget model to determine that currently 17.5 inches per year of freshwater is flowing from the Island to the surrounding estuary under average annual rainfall conditions, and after development approximately 16 inches per year of freshwater will flow from the Island to the estuary—less than a 10% change in groundwater flowing to the estuary.

33. Therefore, the subject development will not adversely impact the overall water balance on Fort George Island. Utilizing the water budget model, under developed conditions it is shown that in a one-in-ten dry year there will be slightly more fresh water flow from the Island, and in a one-in-ten wet year there will be slightly less freshwater flow to the estuary than currently exists. This further demonstrates that overall water balance will be maintained. Total recharge will be greater post-development in average, wet and dry years.

34. Fairfield's stormwater management system consists of a series of gold course fairway retention areas, and also includes four ponds in the north of the Island which are interconnected, and one in the south, into which storm water will flow. The retention ponds comprise an area of approximately 32 acres. The fairway retention areas maximize percolation or infiltration, and water that remains to enter these ponds will be used for golf course irrigation through pumping. Generally, 95% of golf course need will be met by such pumping from the ponds, with the remaining need being met by withdrawals from the Floridan Aquifer. Under dry conditions, the need to withdraw from the Floridan Aquifer will be greater and could approach 49% of golf course irrigation requirements.

35. The fairway retention areas and the five storage ponds comprise an on-line treatment system which will retain the first one-half inch of runoff, as well as additional runoff. Fairfield's on-line system is equivalent to an off-line system required by Rule Chapter 40C-42, *Florida Administrative Code*, for discharges to Outstanding Florida Waters (OFW) such as those that surround Fort George Island. Thus, the "first flush" containing a higher level of pollutants will be received by the retention areas and ponds in this on-line system and will primarily be removed through percolation in the retention areas. Pollutants should not be discharged into the estuaries, even in emergencies or

201

when conditions exceed design capacity. Pond retention time will be approximately two months and surficial runoff will account for 5%-10% of the water in the ponds, with the rest coming from groundwater in-flow.

36. Fairfield's storm water management system is operational and maintainable. It will be able to retain the 100 year, 24 hour storm event and otherwise meet the District's requirement that post-development discharge not exceed pre-development peak discharge. Surface discharges from the system will occur infrequently, perhaps every 80 years. Currently there is about one-half inch of direct surface runoff annually. Since surface runoff is a primary source of pollutant transport, the elimination of this runoff will have a beneficial effect on the estuary. The system will not degrade the quality of surrounding estuaries or the OFW since discharges to the estuaries will not occur from the ponds except under extreme conditions, and also because of the high level of treatment which will be provided by the ponds. Reasonable assurance has been given that water in the ponds will meet Class III standards, as well as the "free from" standards in Chapter 17-3, *Florida Administrative Code*, in the immediate future. The proposed ponds will be an improvement over existing borrow pits and bogs on the Island which have drastic side slopes and very long residence times, such as the Osmunda Bog, and will be a better habitat for fish and drinking water source for wildlife than the existing pits. It will also result in an improvement to Blue Pond, with better vegetation and habitat than currently exists, and with wildlife access being insured through preservation areas.

37. A recognized and accepted groundwater flow model was used by Fairfield, and was approved by the District for use in this situation. The surficial aquifer system was correctly modeled as a single layer unit. Clay which underlies the Island is not a significant feature since, at minus 18 feet mean sea level, it is well into the saturated zone of the surficial aquifer and well below the surface water table, and since water levels actually observed in test wells could not be predicted when the top of the clay layer was used in the model as the bottom of the surficial aquifer. When the depth of the surficial aquifer was set at the top of the Hawthorne lawyer, the model accurately predicted water levels, as correlated against actual measured levels.

38. Surface waters around Fort George Island have been classified as OFW since 1979. No significant development has taken place on the Island since 1979, and therefore ambient water conditions in 1978 and 1979 could reasonably be expected to have been what they are today.

39. The stormwater management system will create a groundwater

202

divide around the retention ponds. Any water falling inside the divide will flow toward the ponds; water falling outside the divide will percolate to the water table and then flow to the estuary. While under existing conditions nutrient pollutants that reach the water table simply flow to the estuary, after development half of the water falling on the golf course will be inside the divide and will therefore flow to the ponds. Therefore, after development there will be less nutrients and other pollutants reaching the estuary than under current conditions.

40. Fairfield's stormwater management system is designed in a manner to ensure that the first 1½ inches of rainfall will be retained or detained from an OFW. In fact, it appears that the system will actually retain runoff from the first 11 inches of rainfall.

41. After analyzing data for metals, nutrients and coliform bacteria, it is found that the ambient water quality of the estuary will not be degraded by Fairfield's proposed development, and in fact there will actually be a net improvement in the quality of water reaching it from the Island. As a result of pollutant removal through filtration, sedimentation, absorption, precipitation, biological activity and dilution, it can reasonably be expected that groundwater seepage from the fairways and ponds to the OFW will meet primary and secondary drinking water standards, as well as Class II standards, and will not degrade the ambient water quality of the estuary. Infrequent surface discharges to the estuary also will not violate Class II standards. Total loading of nutrients to the OFW under developed conditions will be less than under existing conditions, and coliforms reaching the OFW via groundwater will be eliminated.

42. Freshwater surface flow from the developed area of the Island to the sloughs on the western side of the Island will be virtually eliminated. This elimination will not be detrimental to either salinities or particulate flows to these sloughs. Since there is an average of 50 inches of rainfall on the estuary per year, as opposed to less than ½ inch of freshwater runoff, and since the tidal flow is the forcing function in the estuary and not fresh surface water runoff, the salinity levels in the estuary will be largely unchanged. Particulate material will continue to be readily available to the sloughs from the marshlands, and from perimeter buffers which will be preserved by Fairfield around the Island.

43. An undeveloped, preserved buffer zone is retained between the project and the surrounding waters as well as Rollins Sanctuary. This buffer zone is not intruded upon by the retention ponds, contouring or berms associated with the development. In addition to the buffer zone,

an undisturbed area will also be retained in the development, and the total acreage of the buffer and undisturbed areas will be 226 acres. The buffer and undisturbed areas will be more than adequate to protect the rare, notable, endangered or threatened plant and wildlife species identified on the Island when these areas are considered in relation to Rollins Sanctuary and other properties on the Island in state ownership. There will also be no construction activity in the saltmarsh off the western side of the Island.

44. Extensive surveys conducted by Fairfield identified 26 species of plants and 16 species of wildlife on the Island. The habitat for all but one wildlife species, the gopher tortoise, is the saltmarsh to the west of the Island which will be undisturbed. There will be no adverse impacts on notable plants in Rollins Sanctuary or other preservation areas since a 30 meter buffer is provided on the northern boundary of the Sanctuary and no development at all will take place to the West of the Sanctuary.

45. Woodstorks, the only endangered species identified in the survey, have been observed resting in trees at the western side of the Island in the saltmarsh. They are not nesting on Fort George Island, but return to the D-Dot Ranch south of Jacksonville every night to nest. The western area of the Island will remain undisturbed habitat in a buffer area from 250 to 450 feet wide, as will the southwestern portion of the Island. Woodstorks appear to be using the tidal sloughs for feeding, and development should have no adverse impact on these sloughs.

46. A heron and egret rookery exists on the northern side of the Island, primarily off of Fairfield's property. Approximately 20 nesting pairs of great blue herons and great egrets use this rookery, which appears to be a satellite of regional rookeries. These are not notable species, but Fairfield will provide up to a 600 foot buffer.

47. The gopher tortoise is the only notable terrestrial species on the Island and is a "species of special concern." The undisturbed natural habitat of a major concentration of gopher tortoise on Fairfield's property will be preserved.

48. While the habitat for non-notable species such as bobcat, grey fox, owls and songbirds will be reduced, they will not be extirpated.

49. Significant archaeological sites on Fairfield's property will be preserved and protected, including Mission San Juan del Puerto, the Grave Robbers Mound, the Sugar Mill site, and the Crypt site. If additional sites are found during development, a mitigation plan will be developed for approval by the State Division of Archives, with an

204

evaluation by a professional archaeologist. Indian middens, or trash piles, have been deemed insignificant and will not be preserved.

50. Surface water table drawdowns which will result from Fairfield's system due to pumping from the surficial aquifer will have no adverse impact on either wildlife or plant life on the Island. Such drawdowns will be limited and localized primarily around the ponds. In fact, the water table on the western side of the Island may increase slightly. The drawdown within Rollins Sanctuary or at Rollins Creek will be less than one foot and therefore should not have any adverse impact.

51. Rollins Creek is approximately five feet wide. A fifty foot buffer around the Creek is provided.

52. Only EPA approved chemicals will be used for weed control associated with the ponds, and aeration will be used to assist the production of oxygen in the ponds. Nutrients, nitrates and phosphorous, will be continually analyzed so that immediate corrective action in fertilizer application can be taken if necessary.

53. Fairfield will utilize an integrated pest management program under a plan which must be approved by the District and which will actually reduce the need for chemical pesticides. Only EPA approved pesticides will be used. As for fertilizers, Fairfield will apply fertilizers more frequently, but in lesser amounts, than on the existing golf course. This ensures a better uptake of nitrates and phosphates, thereby reducing unabsorbed nutrients that might flow to the ponds or estuary.

54. A full-time resource manager will be employed to ensure proper operation of the entire stormwater management system.

55. Once the system is in place, Fairfield will conduct a long-term monitoring program of the water quality in the MWBZ, surficial aquifer, the ponds, and any surface water discharges to ensure permit compliance and also to provide a data base for further activities. Such a data base will represent a positive public benefit.

56. Additional beneficial results of the project, after construction permits are obtained, include stabilization of the northern shoreline of the Island which has had notable marshland erosion, and re-aligning a road on the western side of the Island to eliminate a point where it crosses Big Slough and thereby open the Slough up to additional sheetflow. Middle and Northern Sloughs will be preserved. Mitigation will be required for any disturbance of a small wetland area on the west side of the Island which is approximately ¾ of an acre in size. Eliminating marsh erosion, and removing vehicle traffic and flow restrictions in the area of Big Slough are clearly in the public interest, as is the preservation of other wetland areas.

205

57. The District staff originally recommended that Fairfield's MSSW application be denied but after modifications to the application were made, the District staff has recommended approval with conditions to ensure generally that Fairfield:

a) Monitors water quality in the five ponds in accordance with a plan approved by the District, as well as the quantity and quality of all surface water discharges.

b) Monitors water level in surficial aquifer wells and reports such data to the District.

c) Recalibrates its surficial aquifer and water budgets models every five years using the actual monitoring data it has collected and reported to the District in the preceding years, and if such recalibration indicates more than a 50% increase in the volume or frequency of surface water discharges, the stormwater management system must be altered, with District approval, to prevent such increases.

d) Submits a pesticide management plan for District approval.

e) Submits a mitigation plan for District approval, at the time of application for construction permits, that will mitigate for any loss to off-site aquatic and wetland dependent species associated with project development in the area of the tidal sloughs on the west coast of the Island.

A total of fourteen specific conditions which the District staff recommends be placed on the conceptual approval of the MSSW permits are contained in the Management and Storage of Surface Waters Summary Sheet, dated May 1986, which is hereby incorporated by reference and found to be reasonable in its entirety.

### Case Number 85-3596 (CUP)

The following finds of fact are based upon the stipulation of the parties and relate to Fairfield's CUP application:

58. The District, a special taxing district and agency, created by Chapter 373, is charged with the statutory responsibility for the administration and enforcement of permitting programs pursuant to Sections 373.219 and 373.223, *Florida Statutes*, and Chapter 40C-2, *Florida Administrative Code*. The District is the agency involved in this proceeding. The District has assigned Fairfield's CUP application the permit number 2-031-0021AN.

59. Findings of Facts 10, 11, 14 and 15 which are set forth above are hereby re-adopted and incorporated herein.

60. On December 15, 1983, Fairfield, through its then-agent George

206

Register, III, submitted to the District the subject CUP application. The application was assigned No. 2-031-0021AN.

61. On August 23, 1985, the District gave notice of its intent to deny CUP application No. 2-031-0021AN.

62. On September 23, 1985, the District determined to recommend issuance of CUP application No. 2-031-0021AN, as then modified, with conditions.

63. Fairfield had originally contemplated in both its original Master Resource Management Plan (MRMP) and the referenced CUP application that its proposed development for Fort George Island would have a 36-hole golf course facility. Fairfield subsequently reduced its proposed golf course facility from 36 holes to 27 holes. The City of Jacksonville's Planning Commission approved the MRMP with conditions, including the condition that the golf course be reduced, on January 29, 1986.

64. Because of the reduction in size of Fairfield's proposed golf course facility from 36 to 27 holes, Fairfield's total requirements for irrigation water were reduced.

65. By pleading dated February 28, 1986, Fairfield moved to amend its application. The motion was granted by the Hearing Officer on March 11, 1986.

66. In light of this amended application, the District issued a revised "Consumptive Uses of Water Summary Sheet," dated March 24, 1986, to reflect this amended request and to recommend issuance of the CUP.

67. The Petitioners' original Petition For Formal Administrative Proceedings was timely filed within fourteen (14) days of receipt of the District's proposed agency action of September 23, 1985.

68. A number of the members of friends of Fort George, Inc. own real property on Fort George Island, reside on the Island, and possess drinking water wells on the Island and engage in recreational activities on the Island and its adjacent waters and environs.

69. The subject matter of the proposed agency action challenged by Petitioners and Intervenors concerns the water resources on Fort George Island, including its drinking water supply. Protection of this resources falls within the general purpose and objectives of Friends of Fort George, Inc., namely, the preservation, conservation and restoration of Fort George Island and surrounding environs.

70. The relief requested in this proceeding by Petitioner and Intervenor is denial of the proposed consumptive use permit.

71. The water storage ponds proposed in the project will intersect with the surficial aquifer on Fort George Island.

72. The residential value of Petitioners' property on Fort George Island would decrease if the property had absolutely no access to potable water.

73. Petitioners and Intervenors have standing pursuant to Section 403.412(5), *Florida Statutes*, to bring this action.

The following findings of fact relating to Fairfield's CUP application are based upon the evidence presented, including the demeanor and credibility of witnesses who testified:

74. Following review of Fairfield's CUP application, District staff requested additional information on January 11, 1984; Fairfield developed a plan of study to supply the requested additional information, and the plan of study was approved by District staff. The plan of study sought to find out the nature and characteristics of an anomaly in the northeastern part of the Island, and also to determine if Fairfield's proposed usage would have any affect on existing legal users. As part of the study, Fairfield conducted a well inventory and survey, water quality survey, water level measurements, and vertical investigations. The study also examined three alternatives to obtaining water from the various water bearing zones under Fort George Island, including drilling a test well (TP-2) into the Middle Water Bearing Zone after obtaining appropriate permits.

75. The Floridan Aquifer below Fort George Island consists of three zones—The Upper Water Bearing Zone (UWBZ), Middle Water Bearing Zone (MWBZ) and Lower Water Bearing Zone (LWBZ). The bottom of the Hawthorne formation separating the surficial and Floridan aquifers occurs at about 400 feet below mean sea level. The UWBZ exists from a depth of approximately 520 feet to 1000 feet. Below the UWBZ is an upper semiconfining zone from a depth of approximately 1000 to 1200 feet. The MWBZ is generally 300 feet thick and exists from a depth of approximately 1200 to 1700 feet, below which is a lower semiconfining zone from a depth of approximately 1700 to 2000 feet. The MWBZ is a single water producing zone with interconnected channels or flow zones. The LWBZ exists from a depth of approximately 2000 to 2100 feet, below which is a lower confining unit. The confining zones are saturated with water but are less permeable than any of the water bearing zones. Regional groundwater flow in the Floridan Aquifer at Fort George Island is from the west to the east, northeast and southeast.

76. Water quality to a depth of approximately 1900 feet is generally

208

good, with chloride concentrations of less than 50 milligrams per liter (mgl). In the UWBZ chloride concentrations are generally 10-15 mgl. However, in the northeastern part of the Island chloride concentrations are approximately ten times higher, although still considered potable, due to an anomaly which exists in this area with a radius of approximately 1000 feet, and which allows the flow of water directly from the LWBZ to the MWBZ and UWBZ. While the potentiometric surface or pressure for most of the Island is 39 feet, at the anomaly it is 43 feet above mean sea level. The anomaly was caused either by a sinkhole or fault and acts as a localized conduit or point source of lower quality water from the LWBZ to the UWBZ. No other point sources of lower quality water exist on the island. The Hawthorne formation was found to exist approximately fifty feet deeper in the area of the anomaly than on the rest of the Island.

77. Existing users on Fort George Island draw water from the UWBZ. Fairfield proposes to draw its water from the MWBZ at a rate of 101.11 million gallons per year in an average year, and 181.04 million gallons per year in a 1 in 10 dry year, and will be the only user of water from the MWBZ on the Island. Household use consumption is projected to be 129.3 gallons per capita which is below the District average of 150 gallons per capita. Based upon pump tests already conducted by Fairfield, the MWBZ will produce more than enough water to meet Fairfield's needs for its project and such pumping will have no adverse impact on the UWBZ or existing users. Pumping from the MWBZ will also have no adverse impact on the MWBZ. Specifically, salt water intrusion from the surrounding estuary or from the LWBZ to the MWBZ will not significantly increase, chloride levels will not increase and potentiometric levels will not decrease in the MWBZ due to this pumping. The MWBZ will produce an adequate supply of potable water for 15 to 30 years. Fairfield does propose to use well P-1 in the UWBZ in emergency situations but such usage will have not adverse impact on the quality of the UWBZ or its existing users. Use of the MWBZ will be minimized by maximum utilization of the surface water management system ponds for irrigation needs.

78. Well TP-2 is approximately a mile from the anomaly in a south-southwesterly direction. It was constructed by Fairfield, after obtaining necessary permits, with casing to a depth of 771 feet all the way through the UWBZ and into the underlying confining bed. Pump tests were conducted on the MWBZ using TP-2, which is the only well on the Island in the MWBZ. No separate monitoring well in the MWBZ was required by the District, and none was utilized by Fairfield because the flow of 2,000 gallons per minute from TP-2 was so strong that a

**209**

separate monitoring well was not necessary. When TP-2 was pumped, there was no measurable change in nearby UWBZ wells. This confirms that the MWBZ is hydrologically separate from the UWBZ, other than at the anomaly, and pumping from one will not affect wells in the other.

79. In response to a request from the District, Fairfield utilized conservative factors in applying a mathematical model to determine the effects of its proposed pumping on the Floridan Aquifer. Using the USGS contaminant transport model, which is professional accepted and appropriate for use in this case, and after proper calibration to reproduce observed conditions, it was determined that chloride concentrations in the MWBZ will not be adversely affected, nor will potentiometric surfaces of the UWBZ or MWBZ, when pumping is conducted from TP-2 in the MWBZ over a thirty year period. At most, pumping from TP-2 could result in a slight increase of flow from the anomaly into the MWBZ, with a minimal increase in chloride concentrations.

80. Fairfield has agreed to install a monitoring well in the MWBZ and to monitor several wells in the UWBZ in order to constantly test and monitor chloride levels. Currently chloride levels in the MWBZ are 25 mgl and the limit for potable water is 250 mgl. The monitoring well will be approximately 550 feet northeast of well TP-2, and will detect any changes in chloride levels with sufficient lead time for Fairfield to initiate action to drill another well into the MWBZ further from the chloride source. It is estimated that such lead time could reasonably be as much as ten years.

81. Even without Fairfield's pumping from the MWBZ, water quality in the UWBZ would be expected to degrade, as it has historically, as a result of regional pumping which has caused a regional decline in water quality and also as a result of flow from the anomaly. Existing users may actually benefit from Fairfield's pumping from the MWBZ and the decline in the quality of the UWBZ may be slowed due to Fairfield's elimination of golf course irrigation which currently comes from the UWBZ at a rate of approximately 175,000 gallons per day, accounting for approximately 90% of all current water usage on the Island.

82. Pumping from the Floridan Aquifer will be conducted to supplement irrigation from the stormwater management system. Fairfield will use up to 580,000 gallons per day for golf course irrigation in dry years. However, even in a dry year the primary source for golf course irrigation will still be from the stormwater management system.

210

In an average year, approximately 95% of irrigation needs will be met by the surface water management system ponds. In a wet year there should be no need to pump from the Aquifer.

83. The District staff originally recommended denial of Fairfield's CUP application when it was for a 36 hole golf course, and for withdrawal of potable water from the UWBZ with only golf course irrigation being from the MWBZ. Fairfield has modified its application and now proposes a 27 hole golf course with all water needs coming from the MWBZ, except in an emergency when well P-1 in the UWBZ may be used. The District staff has now recommended approval, with a total of twenty conditions contained in the "Consumptive Uses of Water Summary Sheet," which are hereby incorporated by reference and which ensure generally that Fairfield:

a) Mitigates any adverse impact caused by withdrawals permitted herein on existing legal uses of water; the District may curtail any withdrawal if there are adverse impacts on existing legal users.

b) Mitigates any adverse impacts caused by withdrawals permitted herein on existing adjacent land uses; the District may curtail any withdrawal if there are adverse impacts on existing adjacent land uses.

c) Must reapply for another CUP after seven years from issuance.

d) Begins irrigating the existing 18 hole golf course from the MWBZ by March 1, 1987, with existing UWBZ irrigation wells only to be used thereafter for fire protection.

e) Institutes a sampling program for existing wells in the UWBZ and MWBZ.

f) Supplies all potable and supplemental irrigation requirements from the MWBZ, and keeps monthly records of such withdrawals.

g) Drills and maintains a monitoring well in the MWBZ approximately 550 feet northeast of its MWBZ potable and supplemental irrigation well, and provides long term water quality samples to the District from the monitoring well.

The District staff's recommended conditions are found to be reasonable in their entirety.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties and subject matter in this case. Section 120.57(1), *Florida Statutes*. The District's regulatory authority over Fairfield's application for conceptual approval of MSSW is governed by, and subject to, the

provisions of 373, *Florida Statutes*, and the provisions of Chapter 40C-4, *Florida Administrative Code*; the District's regulatory authority over Fairfield's application for CUP is governed by, and subject to, the provisions of Chapter 373, *Florida Statutes*, and Chapter 40C-2, *Florida Administrative Code*.

### Standing

The parties have stipulated to the standing of Friends of Fort George, Inc., Petitioner, and Intervenors Florida Audubon Society, and Duval Audubon Society pursuant to Section 403.412(5), *Florida Statutes*. The parties also stipulated to the standing of Logan Diving, Inc. Based upon stipulated findings of fact 7, 14, and 61, above, individual petitioners are also determined to have standing in this proceeding since they are property owners on Fort George Island in the immediate vicinity of Fairfield's property, and further since they possess drinking water wells on the Island and engage in recreational activities on the Island, as well as its adjacent waters and environs. Individual petitioners will suffer injury in fact if their wells and recreational use of waters on and adjacent to Fort George Island are destroyed, and this injury is the type of injury this proceeding is designed to protect. *Agrico Chemical Co. v. Department of Environmental Regulation*, 406 So.2d 478 (Fla. 2d DCA 1981); *Grove Isle, Ltd. v. Bayshore Homeowners*, 419 So.2d 1046 (Fla. 1st DCA 1982); *North Ridge General Hospital v. NME Hospital*, 478 So.2d 1128 (Fla. 1st DCA 1985). Based upon the testimony of Robert J. Jones, Intervenor Southern Fisheries Association is determined to have standing since its membership includes Duval and Nassau County residents, as well as residents of Fort George Island itself, the association represents commercial fishing, packing and trucking interests which obtain fish and shellfish in the Fort George Island area, and the Association itself was organized to protect the general welfare of the commercial fisheries industry. *Florida Home Builders Association v. Department of Labor and Employment Security*, 412 So.2d 351 (Fla. 1982); *Farmworker Rights Organization, Inc. v. Department of Health and Rehabilitative Services*, 417 So.2d 753 (Fla. 1st DCA 1982).

No evidence or stipulation was entered on the record in support of the Florida Wildlife Federation's standing in this proceeding, and accordingly it has not been established that the Federation has standing in this case. Section 403.412(5), *Florida Statutes*, confers standing on any citizen of the state to intervene in any administrative proceeding involving protection of the state's natural resources upon the filing of a verified petition. The Florida Wildlife Federation filed a verified peti-

tion herein which was opposed by Fairfield, and urged at hearing on May 19, 1986 that it would only call witnesses in support of standing if Fairfield or the District contested standing. Neither Fairfield or the District ever stipulated to standing, the Federation failed to produce any evidence in support thereof. While the Hearing Officer granted the petition to intervene indicating that standing had been properly alleged under Section 403.412(5), the Federation failed to do what it indicated it would on May 19, 1986, when the other parties did not stipulate to its standing, and thereby placed this matter at issue—it failed to produce evidence in support of paragraph one of its petition relating to standing, and accordingly the Florida Wildlife Federation should be dismissed as a party.

### Case No. 85-3537 (MSSW)

In carrying out its responsibilities under Chapter 373, Part IV, *Florida Statutes*, the District has adopted Rule 40C-4.301, *Florida Administrative Code*, which sets forth conditions for issuance of permits and states, in pertinent part:

40C-4.301 Conditions for Issuance of Permits.

(1)(a) To obtain a general or individual permit for operation, maintenance, removal or abandonment of a system or to obtain a conceptual approval permit each applicant must give reasonable assurance that such activity will not:

. . . . . . . . . . .

2. adversely affect recreational development or public lands;

3. endanger life, health, or property;

. . . . . . . . . . .

5. adversely affect the availability of water for reasonable beneficial purposes;

6. be incapable of being effectively operated;

7. adversely affect the operation of a Work of the District established pursuant to Section 373.086, Florida Statutes, and Chapter 40C-6, Florida Administrative Code;

8. adversely affect existing agricultural, commercial, industrial, or residential developments;

9. cause adverse impacts to the quality of receiving waters;

10. adversely affect natural resources, fish and wildlife;

11. increase the potential for damages to off-site property or the public caused by:

a. floodplain development, encroachment or other alteration; or

b. retardance, acceleration, displacement or diversion of surface water; or

c. reduction of natural water storage areas; or

d. facility failure; or

. . . . . . . . . . .

14. otherwise be inconsistent with the overall objectives of the District

. . . . . . . . . . .

(2)(a) To obtain a general or individual permit for construction, alteration, operation, or maintenance of a system or or to obtain a conceptual approval permit each applicant must give reasonable assurance that such activity meets with the following standards:

1. adverse water quantity impacts will not be caused to receiving waters and adjacent lands;

2. surface and ground water levels and surface water flows will not be adversely affected;

3. existing surface water storage and conveyance capabilities will not be adversely affected;

4. the system must be capable of being effectively operated;

5. the activity must not result in adverse impacts to the operation of Works of the District established pursuant to Section 373.086, Florida Statutes;

6. hydrologically-related environmental functions will not be affected;

7. otherwise not be harmful to the water resources of the District.

Additionally, the District has adopted Rule 40C-4.091, *Florida Administrative Code*, which incorporates by reference portions of the *Applicant's Handbook: Management and Storage of Surface Waters*, which sets forth the policies and procedures, and criteria for evaluation of MSSW applications. The *Handbook* also specifies the District's policies regarding conceptual approval of MSSW applications:

Because many water management systems are designed and constructed in phases, a procedure has been established which provides for District review and approval of master development plans. The intent of this procedure is to assure the permittee that the engineering concepts upon which he bases current and future design decisions are likely to meet District rule criteria at least in concept (Part 3.5.1)

The Governing Board's determination that the conceptual plans are consistent with Chapter 373, F.S., and Chapters 40C-4, 40C-40, and 40C-41, F.A.C., will provide the applicant with an assurance that the concepts upon which his designs are based can provide for systems which will not be harmful to the water resources of the District and will not be inconsistent with the overall objectives of the District. (Part 3.5.3)

The conceptual approval permit will be valid for twenty years provided that construction of the initial phase of the system must be permitted and construction undertaken within two years of the granting of the conceptual approval permit and provided that all phases of the system are designed and built in accordance with the terms of the conceptual approval permit, and that all required permits for subsequent phases are obtained. (Part 3.5.4)

The term "conceptual approval permit" is defined in Rule 40C-4.021(2) to mean "a surface water management permit issued by the District, approving the concept of a master plan for a surface water management system, which is binding upon the District and the permittee."

In this case, Fairfield has applied for conceptual approval of its MSSW application and concedes that even if conceptual approval is obtained, it will then have to apply for actual construction, operation or maintenance permits pursuant to Sections 373.413 and 373.416, *Florida Statutes*. In accordance with the above-cited provisions, however, Fairfield's application for conceptual approval must be consistent with Chapter 373, *Florida Statutes*, and Rule Chapter 40C-4, *Florida Administrative Code*, and therefore Fairfield has the burden of establishing compliance with Rule 40C-4.301, *Florida Administrative Code*, set forth above. *Department of Transportation v. J.W.C. Co., Inc.*, 396 So.2d 778 (Fla. 1st DCA 1981); *Balino v. Department of Health and Rehabilitative Services*, 348 So.2d 349 (Fla. 1st DCA 1979).

In order to determine if an applicant has provided reasonable assurance of compliance with Rule 40C-4.301(1)(a), *supra*, the District considers a balancing of specific effects to show the project is not inconsistent with the overall objectives of the District. This balancing approach is used because it is recognized that a proposed project may result in both beneficial and harmful effects. Rule 40C-4.301(1)(b). Thus, an application for conceptual approval should not be denied if, on-balance, the overall effects of the proposed project are beneficial, even if some harmful effects do result.

The evidence in this case establishes that Fairfield's project will not adversely affect recreational development or public lands. Direct sur-

**215**

face water discharges to the estuary will be eliminated, thereby reducing pollutant loading and coliform transport. Groundwater flows to the western sloughs will not be substantially altered post-development. Due to this, as well as the undisturbed continued presence of the extensive saltmarshes on the western side of the Island, the salinity regime and presence of detritus in these sloughs will not be adversely affected. Minor drawdowns which may occur will not adversely affect plants or wildlife in Rollins Sanctuary or other state owned uplands.

Fairfield's project will not adversely affect the availability of water for reasonable beneficial uses. Fairfield will eliminate the withdrawal of water from the UWBZ for golf course irrigation, and this will have a positive impact on the availability of water for existing legal users, all of whom use the UWBZ. It has been demonstrated that there is a more than adequate supply of water in the MWBZ for Fairfield's uses, particularly since Fairfield will not utilize the MWBZ for irrigation purposes. Its proposed use of the surficial aquifer for stormwater retention and irrigation will have a beneficial impact on the availability of potable water in the UWBZ and MWBZ, and at the same time will not result in any violations of applicable groundwater standards.

The stormwater management system is functional and capable of being effectively operated. A resource manager will be employed to monitor the system and ensure it is functioning properly. There is nothing unique about the components to the system.

The proposed development will not adversely affect existing agricultural or industrial developments since none exist on Fort George Island. Fairfield owns the only commercial development, an existing 18 hole golf course, and it will be expanded to a 27 hole course. Existing residents obtain their water frm the UWBZ, and Fairfield will be eliminating the use of the UWBZ for irrigation. This is a positive impact on existing residents. By obtaining all potable water from the MWBZ and irrigation from the stormwater management system, Fairfield will be avoiding any adverse impact on existing residents. The only apparent impact on the private residences would be an increased number of neighbors. Such an impact is a zoning/land use consideration. If the land is not properly zoned so that Fairfield can put its development on the Island, local authorities can pursue zoning concerns, not the District. The operation of Fairfield's proposed system will not divert surface water away from or towards residences or improperly affect ground water.

The quality of receiving waters will not be adversely affected. It is unlikely that the ponds will discharge to the groundwater, and any

**216**

discharge that might occur would be temporary and reversible. Pollutant loading to the estuary will actually be reduced post-development, along with the virtual elimination of coliform transport. Thus, the quality of the discharge will actually be improved over what is presently leaving the Island.

Fairfield's development will not adversely affect natural resources, fish and wildlife. As stated above, there will be a net overall improvement in the quality of water leaving the Island to the surrounding estuary. Surface water table drawdowns will have no adverse impacts on wildlife or plant life, particularly in the area of Rollins Sanctuary, since such drawdowns will be minimal, and the water table may be in fact rise on the western sides of the Island. There will be no violation of Class II water quality criteria or degradation of the ambient water quality of the estuary. Extensive buffers and undisturbed areas will also benefit high value wetlands on the Island, as well as the surrounding estuary. The re-alignment of a road that crosses Big Slough will benefit the Slough by opening it up to additional sheet flow. Fairfield has demonstrated, further, that there will be no adverse impact on woodstorks, herons, gopher tortoises or other wildlife on the Island due to remaining undisturbed habitat, reduction of pollutant loading, increase in sheet flow in the area of Big Slough and increase in the number, quality and size of available surface waters for feeding.

It has been shown that there will be no increase in the potential for flood damage off site after development since the water balance will not be adversely impacted and the stormwater management system will operate within the boundary of Fairfield's property. It has also been shown that Fairfield's stormwater management system will, on-balance, comply with the overall objectives of the District. Far from adversely affecting the surrounding surface waters, Fairfield's system will actually result in reduced pollutant loading generally, elimination of surface water discharges with their attendant pollutant properties, and the reduction, if not elimination, of coliform transport to the estuary. All applicable ground and surface water quality criteria will be met by discharges or seepage from the system. The flora and fauna of the Rollins Sanctuary will not be impacted. The system's operation and maintenance is not expected to have a significant adverse impact on natural resources, fish or wildlife.

Fairfield has therefore given reasonable assurance that its development will meet the conditions for issuance set forth in Rule 40C-4.301(1)(a). Fairfield has also given reasonable assurance that its application for conceptual approval meets the standards set forth in Rule 40C-4.301(2)(a), *supra.*

217

Post-development discharges will be less than currently existing conditions. Drawdowns caused by the project will be minimal and will have no adverse impact on plants or wildlife. The elimination of direct surface water discharges and surface water flow from borrow pits, are beneficial impacts. There will be no adverse impact on the western sloughs and Big Slough will actually benefit from the realignment of a road on the western side of the Island. No violations of applicable water quality standards in the estuary will be caused by Fairfield's system, even in the very infrequent event of a direct surface water discharge from the system. Upland particulate flows and the salt/freshwater regime of the sloughs will likewise be preserved. If anything, the habitat quality of the sloughs will be enhanced. Moreover, Fairfield will be creating 32 acres in enlarged retention ponds with improved habitat qualities. Thus, Fairfield's proposed MSSW system has been demonstrated to be environmentally sensitive.

Chapter 403, *Florida Statutes*, and Rule 40C-42.025, *Florida Administrative Code*, require that "[n]o discharge from a stormwater discharge facility shall cause or contribute to a violation of water quality standards in waters of the state." This rule provision goes on to specify various design and performance standards and an authorization to use alternative treatment methodologies and devices other than those specified in the rule. Rule 40C-42.025(12), *Florida Administrative Code*. The last sentence in Rule 40C-42.041(5), *Florida Administrative Code*, states "[h]owever, facilities which directly discharge to Class I, Class II or Outstanding Florida Waters shall provide additional treatment as specified in Section 40C-42.025(10)." Rule 40C-42.025(10), *Florida Administrative Code*, is a subsection of a rule section entitled, "Design and Performance Standards". Subsection 10 states that direct discharges to Class I, Class II or Outstanding Florida Waters shall include an additional level of treatment equal to fifty percent of the treatment criteria specified in Rule 40C-42.035(1)(b) or Rule 40C-42.041(5) and "shall provide off-line retention or off-line detention with filtration of the first one-half inch of runoff of the total amount required to be treated." The applicant's design for its proposed stormwater facilities does not contain off-line retention or detention. The Petitioners have maintained that because the design for the proposed system does not contain off-line retention or detention, the applicant cannot, seemingly as a matter of law, comply with Rule 40C-42.041(5) and 40C-42.025(10), *Florida Administrative Code*. The Petitioners are in error because their interpretation of the rule fails to account for Rule 40C-42.025(12), *Florida Administrative Code*. Subsection (12) allows for "employing a treatment methodology or device other than

218

those described in Section 40C-42.025." Thus, an interpretation of Rules 40C-42.041 and 40C-42.025, *Florida Administrative Code*, that would not allow for employing something other than the methodology of using off-line retention or detention with filtration whenever there is a direct discharge to Class I, Class II or Outstanding Florida Waters would be an incorrect interpretation of this rule.

The various waters around Fort George Island require a consideration of Rules 17-3.041, 17-3.051, 17-3.061, 17-3.111, 17-3.402, and 17-3.404, *Florida Administrative Code*. Those rules establish the applicable water quality standards for the various types of ambient surface water around and ground water beneath Fort George Island. Rules 17-4.242 and 17-4.245, *Florida Administrative Code*, also must be considered because they establish additional relevant criteria.

All of the surface water around Fort George Island has been designated as Outstanding Florida Waters, but absent that designation the waters around the northern part of the Island would only be Class II and the southern part would be Class III waters. Rule 17-4.242(1), *Florida Administrative Code*, prohibits issuance of a permit if significant degradation would occur unless the proposed activity is clearly in the public interest and the ambient water quality within the OFW will not be lowered as a result of the proposed discharge. Rule 17-4.242(1)(d), *Florida Administrative Code*, states that "existing ambient water quality" means the quality of water reasonably expected to have existed for the year prior to the date an area designated as an OFW. The best scientific information available is to be consulted for that purpose.

Fairfield's storm water management system will infrequently discharge to surface water, and when it does, it will only be in association with extremely large storm events. Therefore, it can be said that discharges from it into the OFW would not significantly degrade the OFW. Additionally, the infrequent discharges themselves will not lower the quality of the OFW. Discharges of pollutants are permitted where the effect on water quality is, as in this case, found to be negligible. *Caloosa Property Owners' Ass'n v. Department of Environmental Regulation*, 462 So.2d 523 (Fla. 1st DCA 1985).

The fresh water flow to the estuary under the proposed system is basically similar to what is now existing. This, coupled with the treatment processes available in the proposed system to abate contaminants before surface and ground waters reach the surrounding waters, indicate that the existing ambient water quality in the OFW will not be lowered and that Class II and Class III standards will not be violated.

**219**

Likewise, the proposed system, in combination with treatment processes that are available, will abate contaminants so that ground water standards will be met. In fact, Fairfield's system will produce an overall improvement in the quality of discharges to the estuary, which is clearly in the public interest.

### Case No. 85-3596 (CUP)

In carrying out its responsibilities under Chapter 373, Part II, *Florida Statutes*, the District has adopted Rule 40C-2.301, *Florida Administrative Code*, which sets forth conditions for issuance of permits and states, in pertinent part:

40C-2.301 Conditions for Issuance of Permits.

. . . . . . . . . . .

(2) To obtain an initial consumptive use permit for a use which will commence after the effective date of implementation, or to obtain a renewal of a consumptive use permit which was issued at any time, the applicant must establish that the proposed use of water:

(a) is a reasonable beneficial use; and

(b) will not interfere with any presently existing legal use of water; and

(c) is consistent with the public interest.

. . . . . . . . . . .

(4) The following criteria must be met in order for a use to be considered reasonably beneficial:

(a) The use must be in such quantity as is necessary for economic and efficient utilization.

(b) The use must be for a purpose that is both reasonable and consistent with the public interest.

(c) The source of water must be capable of producing the requested amounts of water.

(d) The environmental or economic harm caused by the consumptive use must be reduced to an acceptable amount.

(e) To the degree which is financially, environmentally, and socially practicable, available water conservation and reuse measures shall be used or proposed for use.

(f) The consumptive use should not cause significant saline water intrusion or further aggravate currently existing saline water intrusion problems.

(g) The consumptive use should not cause or contribute to flood damage.

(h) The water quality of the source of the water should not be seriously harmed by the consumptive use.

(i) The water quality of the receiving body of water should not be seriously harmed by the consumptive use. A valid permit issued pursuant to Rule 17-4.24 or Rule 17-4.26, *Florida Administrative Code*, shall establish a presumption that this criterion has been met.

.    .    .    .    .    .    .    .    .    .    .

(5)(a) A proposed consumptive use does not meet the criteria for the issuance of a permit set forth in Rule 40C-2.301(2) if such proposed water use will:

1. significantly induce saline water encroachment; or

2. cause the water table or surface water level to be lowered so that stages or vegetation will be adversely and significantly affected on lands other than those owned, leased or otherwise controlled by the applicant; or

3. cause the water table level or aquifer potentiometric surface level to be lowered so that significant and adverse impacts will affect existing legal users; or

4. require the use of water which pursuant to Section 373.223(3), *Florida Statutes*, and Rule 40C-2.301(6), the Board has reserved from use by permit; or

5. cause the rate of flow of a surface water course to be lowered below a minimum flow which has been established pursuant to Section 373.042(1), *Florida Statutes*; or

6. cause the level of a water table aquifer, the potentiometric surface level of an aquifer source, or the water level of a surface water source to be lowered below a minimum level which has been established pursuant to Section 373.042(2), *Florida Statutes*.

See also Sections 373.019(4), 373.219 and 373.223, *Florida Statutes*.

The evidence produced at hearing clearly demonstrates that Fairfield has met the conditions set forth above for issuance of a CUP. The proposed use is in such quantity as is necessary for economic and efficient utilization since the amount to be used for supplemental irrigation is reasonable and well within normal ranges. Conditions to be imposed on the permit will ensure that the stormwater management system will be the primary source of irrigation water for the golf course, and that Fairfield monitor its withdrawals from the MWBZ to ensure compliance with District allocations. There will be no aggrava-

**221**

tion of saline intrusion in the UWBZ or MWBZ and in fact eliminating withdrawals from the UWBZ for irrigation will be a beneficial result of the development.

Pump tests conducted using well TP-2 show that the MWBZ will produce sufficient potable water for the project, as well as water for supplemental irrigation when necessary. There is no evidence that Fairfield's use of the MWBZ will be environmentally harmful or will impact users of the UWBZ. Fairfield's system will actually lessen nutrient loading to the marsh and substantially reduce coliform discharges. By using the stormwater management system as the primary source of its irrigation water, Fairfield is fully utilizing conservation and reuse measures. As the evidence shows, surface water discharges from the system will be very infrequent, and even when they occur they will not violate Class II or OFW ambient water quality standards. The quality of water leaving the Island via the groundwater will actually be improved from current conditions.

While some minor drawdowns will occur as a result of this project, they will be primarily localized around the ponds and will not be of such an extent as to adversely affect vegetation or wildlife. There will be no adverse impacts on existing users of the UWBZ and potentiometric surfaces in the UWBZ will not be lowered.

Therefore, Fairfield has also sustained its burden of proof regarding its CUP application by demonstrating that its proposed use is reasonable and beneficial, and will not interfere with presently existing legal users of the UWBZ, as required by Sections 373.223(1)(a) and (b), *Florida Statutes*. Further, Section 373.223(1)(c) requires a CUP to be "consistent with the public interest." Fairfield has clearly demonstrated that its CUP will be in the public interest because: water conservation and reuse measures will be employed; total amount of water allocated is well within accepted standards; no saline intrusion problems will result potentiometric surfaces will not be lowered; pollutant loading to the estuary will be reduced; and available potable water within the MWBZ will be made available.

Petitioner cites the case of *Booker Creek Preservation v. Mobile Chemical*, 481 So.2d 10 (Fla. 1st DCA 1985) for the proposition that insufficient testing of the MWBZ and the anomaly was performed in this case to provide reasonable assurances that the stormwater management system and proposed consumptive use will not adversely affect water quality. The facts in *Booker Creek* are clearly distinguishable from the fact in this case. In *Booker Creek* it was undisputed that Karst features (faults, sinkholes or vertical fissures) might exist beneath

222

three proposed discharge areas. The Court concluded that when a permit applicant proposes to build massive pollutant discharge facilities in an area where Karst features are found, the performance of tests below one of the three points of discharge cannot, as a matter of law, provide reasonable assurance.

In this case the evidence establishes that there is only one anomaly, which may have been caused by a fault or sinkhole, and it located in the northeastern part of the Island. Fairfield is not proposing massive pollutant discharge facilities. To the contrary, there will be less pollutants transported to the surrounding water post-development than under current conditions. The stormwater management system will contain rainfall on the Island, except under extraordinary conditions which may occur once in 80 years, when discharges will occur on the western side of the Island, at a far distance from the anomaly. Well TP-2 is located between the anomaly and the western discharge points, and a monitoring well will be constructed at sufficient distance from TP-2 to detect any changes in the MWBZ, and to allow the relocation or discontinuation of TP-2. The documentation and testing which Fairfield has already completed is extensive and complete, and the monitoring program it will conduct after development will be comprehensive and thorough. There are no factual similarities between this case and *Booker Creek* that would make that case applicable to the case at hand.

## RECOMMENDATION

Based on the foregoing, it is recommended that the St. Johns River Water Management District issue to Fairfield Communities, Inc., conceptual approval of MSSW permit number 4-031-002AC with conditions set forth in the District's Management and Storage of Surface Waters Summary Sheet, dated May 1986, and also issue to Fairfield Communities, Inc., CUP number 2-031-0021AN with conditions set forth in the District's Consumptive Uses of Water Summary Sheet. Further, it is recommended that the Florida Wildlife Federation be dismissed as a party in this proceeding.

DONE AND ENTERED this 6th day of October, 1986, at Tallahassee, Florida.